UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAVID WILLIAMS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 09-7375** |
| **TRIPLE C ENTERPRISE INC.** <br> **OF LOUISIANA, ET AL** | **SECTION: "C"(2)** |

**ORDER AND REASONS**

This matter comes before the Court on (1) Motion for Summary Judgment filed by Defendant Ocean Marine Operators, LLC ("Ocean Marine"); (2) Motion to Sever Claims filed by Plaintiff; (3) Motion in Limine filed by Defendants International Construction Group, LLC ("ICG") and Lexington Insurance Company ("Lexington"); and (4) Motion in Limine to Strike Plaintiff's Expert filed by Defendants Manson Gulf, LLC ("Manson"), ICG, and Lexington. (Rec. Docs. 97, 100, 119, 132). Having considered the record, the memoranda of counsel and the law, the Court denies Ocean Marine's Motion for Summary Judgment; denies Plaintiff's Motion to Sever Claims; dismisses without prejudice ICG and Lexington's Motion in Limine; and grants Manson, ICG, and Lexington's Motion in Limine to Strike Plaintiff's Expert for the following reasons.

Plaintiff filed this suit under the Jones Act, 46 U.S.C. § 688, and the General Maritime Law, and the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), claiming that he was injured on two occasions while working in the scope of his employment as a contract

welder for C & G Welding Service. (Rec. Doc. 1 at ¶¶ 4-5, Rec. Doc. 29 at ¶ I). His first claim alleges that on May 30, 2009, he injured his left shoulder on the D/B Woton, a barge owned by Defendant Manson, while unloading groceries from a crew boat as part of a human chain. (Rec. Doc. 117 at 2). Specifically, Plaintiff alleges that he was injured when Augustine Betanzos, a contract rigger for Ocean Marine performing work for Manson pursuant to the Marine Master Work Contract ("Contract"), tossed him a five-gallon milk container. (Rec. Doc. 117 at 2). Defendants in this claim are Manson, Manson's insurer Lexington, and Ocean Marine.

Plaintiff's second claim alleges that on October 2, 2009, he injured his back and neck when he was carrying equipment and tripped on the base of a staircase on the IOS 800, a vessel owned and operated by ICG. (Rec. Doc. 100-1 at 2, Rec. Doc. 126-6 at 33). Defendants in this claim are ICG and ICG's insurer Lexington. Defendants C & G Welding Service and Triple C Enterprise of Louisiana, Plaintiff's employers, and C & G's insurer Lloyd's Underwriters, Ltd. were dismissed with prejudice pursuant to a settlement. (Rec. Doc. 81). Accordingly, the sole remaining Defendants in this suit are Ocean Marine, Manson, Lexington, and ICG.

**I. Motion for Summary Judgment by Ocean Marine**

Ocean Marine is a Defendant only with regard to the May 30, 2009, milk-throwing incident that resulted in Plaintiff's shoulder injuries. In its Motion for Summary Judgment, it argues that it is not liable under a theory of *respondeat superior* for Plaintiff's injuries and that instead, Manson is liable under the borrowed servant doctrine because Betanzos, the thrower, was Manson's borrowed employee. (Rec. Doc. 97-3 at 2). In particular, Ocean Marine argues that it merely "furnished" Betanzos to Manson by contract; that it did not control Betanzos's

2

actions and that he was supervised by a Manson-employed rigging supervisor; that Betanzos was performing work for Manson at the time of the incident; that the Contract stating that "Manson shall have no control over Ocean Marine employees in their work for Manson" is not dispositive of the "control" issue; that Betanzos agreed to be Manson's employee or borrowed employee; that Manson supplied the work space and equipment; that Manson had the authority to fire Betanzos; and that Manson paid Betanzos in that Manson paid Ocean Marine a contract price for the workers Ocean Marine provided, and Ocean Marine then paid the workers it furnished to Manson with those funds. (Rec. Doc. 97-3 at 15-16). In its reply to Plaintiff and Manson's Oppositions, Ocean Marine further argues that neither of them have produced any evidence to rebut Ocean Marine's prima facie case that there are no genuine issues of material fact and that therefore Ocean Marine is entitled to summary judgment. (Rec. Doc. 134 at 3).

In his Opposition, Plaintiff concedes that Betanzos was Manson's borrowed employee but argues that this status does not preclude Plaintiff's recovery from Ocean Marine under the theory of *respondeat superior*. Specifically, Plaintiff argues that Ocean Marine had control over Betanzos; that Ocean Marine had the authority to fire Betanzos; and that Ocean Marine paid Betanzos. (Rec. Doc. 117 at 2). In its Opposition, Manson denies that Betanzos was a borrowed employee on the grounds that Ocean Marine fails to controvert the explicit terms of the Contract stating that Manson does not control Ocean Marine contract workers; that Manson did not typically provide equipment to contract workers like Betanzos; that Plaintiff's subjective belief that Betanzos was a Manson employee does not demonstrate that this was in fact the case; and that no unbiased evidence in the record resolves the material fact of who controlled Betanzos's daily activities. (Rec. Doc. 113 at 4-7). In its Reply, Manson argues that Ocean Marine has

3

failed to make a prima facie case that no genuine issues of material fact exist, and thus the burden has not shifted to Manson to rebut that case. (Rec. Doc. 130 at 2).

### A. Summary Judgment Standard

Summary judgment is proper only when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1996). When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on unsubstantiated assertions and conclusory allegations. *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994).

### B. Borrowed Servant v. Independent Contractor

An employer is liable under the theory of *respondeat superior* for the negligent actions of its borrowed employees. *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977). To

determine whether Betanzos is a "borrowed employee" of Manson, the court's first premise is based on the "borrowed employee" standard announced in *Standard Oil v. Anderson*, 212 U.S. 215 (1909).

> One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent, or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation.

*Id.* at 220.

The Fifth Circuit has held that the following nine factors must be considered in determining borrowed employee status.

> (1) Who had control over the employee and the work he was performing, beyond the mere suggestion of details or cooperation?
> (2) Whose work was being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?

*Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir. 1993), *reh'g denied*, 3 F.3d 441 (5th Cir. 1993). No one factor is determinative, but the Fifth Circuit has stated that control is the "central" issue of borrowed employee status. *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988), *amended*, 841 F.2d 572 (5th Cir. 1988). "The question of borrowed employee status is a question of law for the district court to determine." *Billizon*, 993 F.2d at 105. However, "in some cases, factual disputes must be resolved before the district court can make its legal determination." *Id.*

The first and third factors are best analyzed together in this case, given that Ocean

Marine and Manson were parties to a contract that explicitly addressed the level of control each had over employees. To determine who had control over the employee, the court must distinguish "'between authoritative direction and control, and mere suggestion as to the details or the necessary cooperation, where the work furnished is part of a larger undertaking.'" *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 313 (5th Cir. 1969)(quoting *Standard Oil*, 212 U.S. at 222). The Contract between Ocean Marine and Manson states that Manson had no control over how Ocean Marine employees achieved the final product Manson asked them to perform. It states, in relevant part:

> Contractor [Ocean Marine] shall be an independent contractor with respect to the performance of all work hereunder, and neither Contractor nor anyone employed by Contractor shall be deemed for any purpose to be the employee, agent, servant, or representative of Manson in the performance of any work or service or part thereof in any manner dealt with hereunder. Manson shall have no direction or control of Contractor or its employees and agents except with respect to the final results to be obtained.

(Rec. Doc. 97, Ex. A at ¶ 14(a)).

The language of the contract between the general employer and the borrowing employer does not necessarily resolve the issue of control: "the reality at the work site and the parties' actions in carrying out a contract [...] can impliedly modify, alter or waive express contract provisions." *Melancon*, 834 F.2d at 1245. However, the evidence Ocean Marine supplies fails to rebut the presumption that the contractual language controls. Specifically, Ocean Marine relies on the affidavit of Carlos Izaguirre, Ocean Marine's Supervisor of Personnel and Safety, but the affidavit contains statements that merely conclude without explanation that Betanzos was under Manson's control. (*See, e.g.*, Rec. Doc. 97-7 at ¶¶ 13-15). Neither Manson nor Plaintiff have cross-examined Mr. Izaguirre. Ocean Marine also argues that Plaintiff's belief that

Betanzos was a Manson employee suggests that Betanzos was indeed a Manson employee. (Rec. Doc. 97-2 at 14, Rec. Doc. 97-5 at 98, 99). However, as Manson notes, Plaintiff is in no position to know the work status of other contract employees. (Rec. Doc. 113 at 6). There is no deposition testimony from Betanzos or anyone who performed the same job as Betanzos or Betanzos's supervisor that day. The absence of deposition testimony by the employee whose status is in question or another employee who performs the same work, or a supervisor of such employees, raises "a significant unresolved factual issue" regarding the employee's responsibilities and the employers' control over him. *Gautreaux v. Apache Corp.*, 2010 U.S. Dist. 2010 108004, *7 (2010). Therefore, a genuine issue of material fact exists as to the extent of Ocean Marine and Manson's control over Betanzos on the day of Plaintiff's accident.

As to sixth factor, the parties disagree as to whether Manson or Ocean Marine or a third party provided equipment for work on the D/B WOTAN. Ocean Marine states, without citation, that "Manson supplied Mr. Betanzos and other riggers with tools and equipment to do their assigned tasks." (Rec. Doc. 97-2 at 14). In contrast, Manson points to Manson's Operation's Manager E.J. Goubert's deposition testimony in which he states that Manson does not typically provide tools and equipment to contract workers. (Rec. Doc. 113 at 6, Rec. Doc. 113-3 at 25-26). Because Manson cites to evidence and Ocean Marine does not, this factor weighs against borrowed employee status.

With respect to the ninth factor, Izaguirre's affidavit states that Betanzos's wages were paid by Ocean Marine from funds it received from Manson. (Rec. Doc. 97-7 at ¶ 11). Thus, Manson ultimately paid Betanzos. This arrangement supports a finding of borrowed employee status. *See Melancon*, 834 F.2d at 1246.

7

Finally, there is insufficient evidence for this Court to determine whether an unresolved factual issue exists with regards to factors 2 (whose work was being performed), 4 (whether Betanzos consented to be a borrowed servant of Manson), 5 (whether Ocean Marine terminated Betanzos), 7 (whether Betanzos's employment with Manson was over a considerable length of time), and 8 (who had the right to discharge the employee). Although the parties agree that Betanzos was present on the D/B WOTAN on May 30, 2009, and that he tossed a five-gallon milk container to Plaintiff as part of a man-to-man grocery-unloading chain, none of the evidence describes what Betanzos was doing on the vessel that day or his specific relationship to either employer. Accordingly, none of these factors weigh in favor or against borrowed employee status.

Plaintiff concedes that Betanzos is a borrowed employee of Manson, but argues that according to *Lejeune v. Allstate Insurance Co.*, 365 So. 2d 471, 482 (La. 1978), this status does not preclude recovery from Ocean Marine under the theory of *respondeat superior*. (Rec. Doc. 117 at 2). Because this Court disagrees with Plaintiff's contention and finds that Ocean Marine has failed to make a prima facie case that no genuine issues of material fact exist as to whether Betanzos is Manson's borrowed employee, it declines to address that theory of recovery and denies Ocean Marine's Motion for Summary Judgment. (Rec. Doc. 97).

### II. **Motion to Sever Claims by Plaintiff**

In his Motion to Sever Claims, Plaintiff argues that his first claim relating to his May 30, 2009 shoulder injuries and his second claim relating to his October 2, 2009 neck and back injuries should be severed because trying them together will confuse the jury and result in an

8

unfair disposition of the case. (Rec. Doc. 100-1 at 3-4). In support of this argument, Plaintiff cites that his employer, C & G, who used to be a defendant in both claims, is no longer in the case; that some of the defendants are unconnected; that the injuries are distinct; and that witnesses for each incident will be different. (Rec. Doc. 100-1 at 3). In their opposition, Defendants Manson and Lexington argue that all five factors courts consider in deciding whether to sever claims weigh in favor of maintaining the claims together. (Rec. Doc. 112 at 1). Namely, the two claims arise out of the same series of occurrences; they share questions of law and fact; and severance would harm judicial economy, prejudice Defendants because by creating the risk of double recovery, and cause duplicative discovery and proceedings.

Rule 42 of the Federal Rules of Civil Procedure provides that "[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim...." Fed. R. Civ. P. 42(b). In addition, Rule 21 gives district courts the authority to sever claims in a single suit. Fed. R. Civ. P. 21. The district court has broad discretion to sever issues to be tried. *Xavier v. Belfor Group USA, Inc.*, 2008 WL 4862549 at *3 (E.D. La. 2008) (citing *Brunet v. United Gas Pipeline Company*, 15 F.3d 500, 505 (5th Cir. 1995). Piecemeal trial of separate claims or issues in a single suit is "not the usual course." Charles Alan Wright & Arthur R. Miller, 9 Federal Practice & Procedure § 2388 (West 2011). The Court's determination as to whether to sever claims under Rule 21 or order separate trials under Rule 42 requires the same considerations. *Disparte v. Corporate Executive Bd.*, 223 F.R.D. 7, 12 (D.D.C. 2004). They are:

> (1) whether the claims arose out of the same transaction or occurrence; (2) whether the claims present common questions of law or fact; (3) whether settlement or judicial economy would be promoted; (4) whether prejudice would be averted by severance; and (5) whether different witnesses and documentary

proof are required for separate claims.

*Kreger v. General Steel Corp.*, 2011 WL 1594839 (E.D. La. 2011).

All five factors weigh in favor of denying Plaintiff's Motion. The Court notes that the two claims arise out of two separate incidents that occurred at different times (May 30, 2009 and October 2, 2009), on different boats (D/B WOTAN and IOS 800) owned by two different companies (Manson and International Construction Group). However, the incidents arguably create a "series" in that Plaintiff's injuries in the first incident may have aggravated his injuries in the second. This is especially true since Plaintiff concedes that he returned to work while still in pain from his first injury, and that he was still in pain from it when he was injured the second time. (Rec. Doc. 112-1 at 2-8). Furthermore, as Manson indicates in its Opposition, it would be difficult to consider the injuries separately since the shoulder, affected in the first incident, and neck and back, affected in the second incident, are anatomically closely connected. (Rec. Doc. 112 at 4). Thus, the claims have overlapping questions of fact such as what caused Plaintiff's shoulder, neck, and back to be injured, and whether Plaintiff mitigated his damages when he returned to work while still in pain from the first incident. Furthermore, severing the claims would likely require duplicative testimony, for instance, from Plaintiff's doctor or medical experts, and it could prejudice the Defendants by making it more likely that Plaintiff will obtain double recovery for his injuries rather than having a jury consider the injuries according to the totality of the circumstances. Finally, Plaintiff offers no reasons why trying the two claims together would confuse a jury. (Rec. Doc. 100 at 4).

### III. **Motion in Limine by ICG and Lexington**

ICG and Lexington ask this Court to exclude any evidence of subsequent remedial remedies, and especially any evidence concerning "modifications and/or extensions made to the handrail on the stairway located on the IOS 800, following the incident on October 2, 2009...." (Rec. Doc. 119). They first argue that under Rule 407 of the Federal Rules of Evidence, such evidence is inadmissable to prove negligence on ICG's part. (Rec. Doc. 119-2 at 1). They next argue that such evidence is "not necessary" for any other purpose for which it would be admissible under that rule. *Id.* In his Opposition, Plaintiff argues that he intends to use evidence in ways that are permissible under Rule 407, namely to demonstrate that the feasibility of precautionary measures is controverted, and for impeachment purposes. (Rec. Doc. 138).

At the time this suit was filed, Rule 407 of the Federal Rules of Evidence stated:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent remedial measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Fed. R. Evid. 407.[1] Given that discovery is not yet complete in this case, and given that the

---

[1]As of December 1, 2011, Rule 407 reads as follows:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
> * negligence;
> * culpable conduct;
> * a defect in a product or design; or
> * a need for a warning or instruction.
> But the court may admit this evidence for another purpose, such as impeachment or – if disputed – proving ownership, control, or the feasibility of precautionary measures.

11

circumstances under which evidence of subsequent remedial measures can be admissible depend on highly factual determinations, this Court finds that a ruling on this motion would be premature. Accordingly, it dismisses the motion without prejudice.

### IV. Motion in Limine to Strike Plaintiff's Expert by Manson, ICG, and Lexington

Manson, ICG and Lexington seek to exclude the opinions and testimony of Plaintiff's expert, Dennis Howard, under Rule 702 of the Federal Rules of Evidence, on the ground that they are unreliable because Howard has little to no experience with marine safety and because he fails to explain the method he used to make his conclusions. (Rec. Doc. 132-1 at 4-6). They also argue that Howard's testimony is irrelevant because a layperson does not need an expert's opinions to understand the circumstances of the incidents in this case. (Rec. Doc. 132-1 at 6-7). In his Opposition, Plaintiff first argues that Howard's testimony is reliable because he has over thirty years of experience as president of a safety management company and consultant to various entities, including ones that perform "ship building." (Rec. Doc. 143, citing 132-6 at 1). Plaintiff next argues that Howard's testimony is relevant because it will assist the trier of fact in understanding "material handling" and "trip hazards" on ships as they relate to the May 30,2009 and October 2, 2009 accidents. (Rec. Doc. 143 at 5).

Rule 702 governs the admissibility of expert testimony and reports. At the time this suit was filed, it stated:

> If scientific, technical, or other specialized knowledge will assist the trier of fact

---

Fed. R. Evid. 407 (2011). This amendment does not change the Court's analysis or conclusion with respect to ICG and Lexington's Motion in Limine. (Rec. Doc. 119).

> to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[2]

Rule 702 was amended in 2000 to reflect the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The *Daubert* decision changed the criteria for the admissibility of expert testimony and charged trial courts to act as "gate-keepers" to ensure that the proffered testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. In *Kumho Tire,* the Supreme Court held that the relevant and reliable standard announced in *Daubert* for scientific expert testimony applied to all types of expert testimony. *Kumho Tire*, 526 U.S. at 147.

In *Daubert,* the Supreme Court created a two-prong test for trial judges to determine the admissibility of expert testimony. To admit expert testimony, a court "must determine at the

---

[2]As of December 1, 2011, Rule 407 reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 407 (2011).

13

outset, pursuant to Rule 104(a), whether the expert is proposing to testify to: (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. Additionally, both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id.* at 595. This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* Thus, the first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology. In determining an expert's reliability, the court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Several factors which may be considered in determining the soundness of the scientific methodology include: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards; and (4) whether the theory or technique used has been generally accepted. *Id.* at 593-94. These factors do not constitute a definitive checklist or test. *Kumho Tire*, 526 U.S. at 144. Instead, they compose a nonexclusive, flexible test to ascertain the validity or reliability of the methodology the expert employed. *Id.* The applicability of each factor depends on the particular facts of the case. *Id.*

The second prong, whether the proposed testimony will assist the trier of fact to understand or determine a fact in issue, goes primarily to the issue of relevancy. *Daubert*, 509 U.S. at 591. *Daubert* described this examination as a question of whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Id.,* citing United States v. Downing, 752 F.2d 1224, 1242 (3rd Cir.

1985). As noted in *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. 2002), Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Therefore, expert testimony is not relevant, and thus, inadmissable, if it is not helpful. "Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." *Peters v. Five Star Marine*, 898 F.2d 448, 450 (5th Cir. 1990). The Court in *Peters* ruled that it is within the discretion of the trial judge to decide "that the [fact-finder] could adeptly assess the situation using only their common experience and knowledge", and thus exclude expert testimony on that basis. If the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded. *In re Midland Enterprises, Inc.*, 2002 WL 31780156 at *3 (E.D. La. 2002). The burden of proving admissibility of expert testimony is on the proponent of that testimony. *U.S. v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003).

Plaintiff fails to meet this burden. Expert testimony has been stricken in cases where the plaintiff was injured while performing work on a boat. *See Bouton v. Kim Susan Inc.*, 1997 WL 61450 at *1-2 (Vance, J. E.D. La. 1997) (excluding expert testimony as to whether employer provided safe conditions where plaintiff slipped and fell while unloading piping on an offshore drilling vessel); and *Materne v. MISR Shipping Co.*, 1991 WL 99426 at *1 (E.D. La. 1991) (striking expert testimony as to whether means of ingress and egress onto a vessel were safe when plaintiff fell while attempting to board vessel).

Like in *Bouton* and *Matherne*, the injuries in this case resulted from routine

15

circumstances: an allegedly bad throw of a five-gallon container of milk, and a slip and fall that occurred while Plaintiff was carrying equipment.  To justify the need for Howard's opinions with respect to milk container incident, Plaintiff cites Howard's testimony: "[m]ost people may not understand or appreciate in the industrial world, the impact about what a man does when he faces these circumstances."  (Rec. Doc. 143 at 6) (citing Rec. Doc. 143-1 at 16-17).  Plaintiff adds: "Mr. Howard feels that he could help explain to the jury in a way that would give them experiences and perspectives that most of them would not have." (Rec. Doc. 143 at 6).  The Court finds this explanation unconvincing.   Because this Court finds that the trier of fact could understand the circumstances of Plaintiff's two accidents in this case based on their own experiences, Howard's testimony should be excluded, and this Court need not determine whether his opinions were reliable under Rule 702 and *Daubert* principles.

Accordingly,

IT IS ORDERED that Defendant Ocean Marine's Motion for Summary Judgment is DENIED.  (Rec. Doc. 97).

IT IS FURTHER ORDERED that Plaintiff's Motion to Sever Claims is DENIED.  (Rec. Doc. 100).

IT IS FURTHER ORDERED that Defendants International Construction Group, L.L.C. and Lexington Insurance Company's Motion in Limine is DENIED WITHOUT PREJUDICE. (Rec. Doc. 119).

IT IS FURTHER ORDERED that Defendants Manson Gulf, L.L.C., International Construction Group, L.L.C., and Lexington Insurance Company's Motion in Limine to Strike

Plaintiff's Expert is GRANTED.

New Orleans, this 27th day of December, 2011.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE